UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION


| | | |
|---|---|---|
| SULLIVAN'S ADMINISTRATIVE | : | Case No. CV412-212 |
| MANAGERS II, LLC, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| vs. | : | |
| | : | |
| GUARANTEE INSURANCE COMPANY, | : | |
| ULLICO CASUALTY COMPANY, and | : | |
| PATRIOT NATIONAL INSURANCE GROUP, | : | |
| INC., | : | Savannah, Georgia |
| | : | January 17, 2013 |
| Defendants. | : | 2:12 p.m. |
| _____ | : | |


MOTIONS HEARING/STATUS CONFERENCE
BEFORE THE HONORABLE LISA GODBEY WOOD
United States Chief District Judge

_____



Reported By:            Norma Hatfield, FPR
                        Official Court Reporter
                        801 Gloucester Street, Rm. 216
                        Post Office Box 1316
                        Brunswick, Georgia 31521-1316
                        (912) 262-2608 or (912) 262-9989
                        normah3@comcast.net
                        Norma_Hatfield@gas.uscourts.gov

APPEARANCES:


For the Plaintiff:        BRENT J. SAVAGE, ESQUIRE
                          Savage, Turner, Pinckeny & Madison
                          Post Office Box 10600
                          Savannah, Georgia 31412
                          (912) 231-1140
                          bsavage@savagelawfirm.net

For the Defense:          MARY O. MORRIS, ESQUIRE
                          Morris & Morris, PA
                          777 S. Flagler Drive
                          Suite 800 - West Tower
                          West Palm Beach, Florida 33401
                          (561) 838-9811
                          momorris@morris-morris.com

                          JOHN V. BURCH, ESQUIRE
                          Bovis, Kyle & Burch, LLC
                          200 Ashford Center North
                          Suite 500
                          Atlanta, Georgia 30338-2668
                          (770) 391-9100
                          jvb@boviskyle.com

1                    P R O C E E D I N G S

2                 (Call to Order at 2:12 p.m.)

3          THE COURT:  Good afternoon.  Mr. Fritz, call the

4    case.

5          THE CLERK:  The Court calls civil case 412-212,

6    Sullivan's Administrative Managers II, LLC versus Guarantee

7    Insurance Company, Ullico Casualty Company, Patriot National

8    Insurance Group.  Representing the Plaintiff is Brent

9    Savage.  Representing the Defendants is John Burch and Mary

10   Morris.

11         THE COURT:  Ready for the Plaintiff?

12         MR. SAVAGE:  Yes, ma'am.

13         THE COURT:  Ready for the Defense?

14         MS. MORRIS:  Yes, Your Honor.

15         THE COURT:  Counsel, as you know, I have just

16   recently acquired this case from my colleague, and I wanted

17   to set us down today to have a status conference and then to

18   hear what you can say at this point about the motion for

19   summary judgment that has been filed by the Plaintiff and is

20   currently pending.

21         I understand that the motions period has not yet

22   expired.  I think it is until February 7th that further

23   dispositive motions may be filed by either side.

24         Let me make sure we are all on the same page

25   regarding some events.  I understand that Docket Number 12,

1    the motion to dismiss that was filed with regard to the

2    RICO, that that is now mooted.

3              MR. SAVAGE:  Right.  We withdrew that claim.

4              THE COURT:  Mr. Fritz, if you will let the case

5    record reflect that by oral order this afternoon, the case

6    should reflect that that motion to dismiss is denied as moot

7    upon the Plaintiff's withdrawal of the RICO claim.

8              But what is not moot is the Plaintiff's motion for

9    summary judgment.

10             MR. SAVAGE:  Yes, ma'am.

11             THE COURT:  And I did get a chance to read your

12   response that came in on the 14th, and the Plaintiff may

13   file a reply to that.  But while we are all here, I will

14   hear any oral argument that needs to be made regarding that.

15             Let's start with the movant.

16             MR. SAVAGE:  Thank you, Your Honor.

17             There's really two issues before the Court:  Is

18   Sullivan Management II the proper plaintiff, which I would

19   like to, hopefully, make quick work of.  I'm going to try to

20   use this Elmo properly.

21             This case was filed after a case was filed in

22   Florida, which is a case that was filed, I think, in the

23   state court system down there.

24             THE COURT:  If you know, what is the current

25   status of the Florida state case?

1          MR. SAVAGE:  Ms. Morris can address that better.

2     She is in both cases.  From what I understood -- I called my

3     co-counsel, I guess he is, down there, and I think they're

4     kind of on hold is what he told me yesterday.

5          But Ms. Morris is a worthy advocate, and she can

6     say where they are.

7          MS. MORRIS:  Thank you, Mr. Savage.

8          Your Honor, the Plaintiff in the Broward County,

9     Ft. Lauderdale Circuit Court action is different.  It is

10    what we consider the principal named insured on the

11    policies, Sullivan I.  Although Mr. Savage is correct and he

12    will show the Court that Sullivan II is an additional named

13    insured, certainly under the policies at issue.

14         As regards to the Broward Circuit litigation, the

15    case is at issue.  A trial order has not been entered

16    because what we call an "At Issue Notice" in Florida has not

17    been filed.  We are within the discovery period.

18         I recently responded to some discovery propounded

19    by Mr. Salzman, who represents Sullivan I.  There is no

20    counterclaim in that action.  There are two plaintiffs,

21    Ullico Casualty and Guarantee -- not Patriot who is not a

22    part of the Broward Circuit litigation.  And it seeks by

23    contract claim similar to our counterclaim here premiums due

24    from Sullivan I, of course, that we allege to be due.

25         THE COURT:  Thank you.

1        All right, Mr. Savage.

2        MR. SAVAGE:  Here is the problem with that

3   argument.  When we filed this suit in state court here, we

4   allege that Sullivan Administrative Management II was issued

5   certain policies from '08 through, basically, 2010.  So we

6   have Sullivan Administrative Management II.

7        In their answer, they have admitted that those

8   policies were issued to Sullivan Administrative Management

9   II.  I think it's over on that point.

10       Additionally, there is no such legal entity as

11  Sullivan Administrative Management I.  That comes by way of

12  the testimony of Neff McIntosh that's in the record.

13       There is a problem in this case, and I don't think

14  it changes the fact that I think our motion is dispositive.

15  But we never got copies of these policies.  Guarantee

16  Insurance is going to say they gave them to our agent, J. P.

17  Gallagher, down in Florida, but we never saw any of these.

18       So what they're coming in and saying is that the

19  insured is Sullivan Administrative Management I.  There is

20  no such legal entity, and we've established that in the

21  record.  There never was, never is.

22       The federal tax ID number on all of these policies

23  is Sullivan Administrative Management II, which is a LLC.

24  It is registered with the State of Georgia.

25       In their answer they say that all these policies

1    were issued to Sullivan Administrative Management II.  I

2    think that is over, that issue.

3         What we believe is that we took -- and Ms. Morris

4    is an excellent lawyer.  She really is good on this

5    insurance stuff, and we have had a pleasant relationship.

6    We just believe that we are right in this circumstance.

7         But we took a 30(b)(6) deposition of Guarantee

8    Insurance Company.  And essentially, they've admitted the

9    case away in our mind.  They have a policy that we finally

10   saw that says they would pay, basically, claims costs in

11   this.  I have the operative language here, that they would

12   pay all expenses that were incurred.

13        These are not cheap policies.  These are what you

14   would call professional employer policies where you would

15   take a law firm like Savage and Turner, and they would do

16   our payroll and everything else.  And you group bunches of

17   companies together so, hopefully, Mr. Sullivan, seated over

18   here to my right, would get better rates.  That's the

19   operative term, and they're becoming, hopefully, more and

20   more popular where you put small employers together and

21   group these policies.

22        What this policy says on the Workers' Comp, which

23   is what's at issue in this case, is, "We will pay the

24   costs."  And there's a $250,000 deductible, and the premiums

25   are in the neighborhood of $300,000.  They're not cheap.

1   And we'll get into what Mr. Petzold said, the fellow that

2   negotiated these polices with Guarantee Insurance here.

3          But the policy clearly said -- and there's a

4   typical merger clause -- that we will pay the costs.

5          THE COURT:  What about the endorsement?

6          MR. SAVAGE:  It's interesting, because they attach

7   in their counterclaim the policies.  There is no endorsement

8   in those policies that they attach that says that we pay --

9   that we pay, it comes back on us -- these claims costs.  We

10  got into that in a 30(b)(6) format.

11         What they do when they want to be paid back is

12  they do as they did in the sheet I have up in front of you,

13  is they will pay the deductible.  But they say specifically

14  in the policy, "If we pay, you pay us back."

15  There's nothing in this policy that we view, except by

16  really tangential, potential endorsements that I saw for the

17  first time on the 14th of January that says that we have to

18  pay any type of claims costs, which is what they call ALAE

19  that we'll talk about in just a second.

20         But they say, "We'll pay it."  That's what our

21  agent says was the understanding.  When I took their

22  deposition, they have some very savvy guys.  They have a guy

23  named Frank Kushler who is basically running this company at

24  this point.  And I asked him the question, "Who is

25  responsible to pay the claims costs?"  I have part of his

1    deposition right there.  And he says clearly, "That would be

2    our responsibility."  That's what they said when we took the

3    30(b)(6) deposition.

4            And 30(b)(6) depositions have broad ramifications.

5    You can't come in and kind of play what I would analogize as

6    a boxing thing where Muhammad Ali would play "Rope-a-Dope"

7    would come in and take a 30(b)(6) deposition and say, "We're

8    going to pay the claims costs here," and them come flying

9    out at us in response to summary judgment and say, "Oh,

10   well, none of that counted."

11           I think Georgia substantive law applies under a

12   long progeny of cases.  The least attractive version of

13   things where I take their head of the company who is

14   supposed to pay the claims costs and he says we're supposed

15   to pay the claims costs.

16           They also have a lady who has signed an affidavit,

17   Ms. Grandmaison, who says what you do is go from a policy,

18   but you go back to a plan.  And I asked her, "Is there

19   anywhere in the plan where it says we pay these costs?"  And

20   she says, "There's nothing in the program agreement which

21   allows Guarantee to charge these costs to Sullivans."

22           Unbeknownst to us, we paid about $600,000 in

23   claims costs, and we finally figured that out.  I don't

24   think it's a voluntary payment, which is where they're

25   trying to go.  But we've paid it through the years and then

1    finally found out that we were over paying.

2           But both their key folks have said there is

3    nothing in the policy that requires us to pay the claims

4    costs.  If there is controversy in this case, it's a one on

5    nothing fast break, because the only person who negotiated

6    this -- it's between a fellow on their side named Skylar

7    Rupp.  As the Court knows I'm -- I will leave that.  I'm

8    catching up.

9           I do not believe Mr. Rupp filed an affidavit to

10   contradict Mr. Petzold.  I know they don't think Mr.

11   Petzold's affidavit is any good.  But if there is a

12   controversy here on what was meant -- and there's a

13   requirement in Georgia that the policy must comport with the

14   negotiations.  We got the guy who negotiated this.  Well,

15   Petzold said, "We went over this stuff."  These are very

16   savvy guys.  "And they weren't supposed to pay claims costs

17   and should have to do that."

18          THE COURT:  Is it the Plaintiff's position that

19   Florida law applies or Georgia law?

20          MR. SAVAGE:  Georgia, I think for the area where

21   the delivery of the policy was.  We are, essentially, a

22   Georgia company.  We have some stuff in South Carolina and a

23   modicum of stuff in Florida.

24          THE COURT:  Your motion is pitched as a motion for

25   partial summary judgment.

1          MR. SAVAGE:  Right.

2          THE COURT:  Which causes of action would you

3     contend are covered?

4          MR. SAVAGE:  We contend that the right to get back

5     the money that we paid for the claims costs is covered by

6     the partial summary judgment.

7          THE COURT:  So breach of contract?

8          MR. SAVAGE:  Yes, ma'am.

9          You know, I see all the time thirty page summary

10    judgments and people file them at the end.  Ms. Morris and I

11    have tried to talk about where we're going in the case.  We

12    had a good meeting after the 30(b)(6)s.  I think we'll meet

13    again today after this.

14          It's really simple.  I could talk about it and

15    restate my position.  We have the right plaintiff.  They

16    have admitted we have the right plaintiff in the answer.

17    They have said in the 30(b)(6) depositions that I took that

18    we're not responsible for the claims costs.

19          They're going to come in and say we're responsible

20    to pay what are called ALAE costs.  ALAE costs would be

21    specific to the individual claim.  If you think I'm faking

22    with my injury and you hire an investigator, that would be

23    specific to my claim.

24          Claims costs are different than that, which would

25    be -- I think they try to justify this, but this really

1    sounds bad to me.  They have a nurse case manager from a

2    company that they used to own assigned to every Workers'

3    Comp case, which means if I -- and I asked them this

4    question -- if I scratch myself -- and I guess I'm covered

5    by Comp over here this afternoon -- and I put a claim in

6    with my Comp carrier, I would get a nurse case manager from

7    one of their subsidiary companies, and that is a claims

8    cost.  I think they're 90 an hour.  I'm shooting from

9    memory.

10          But those types of things, even in this tangential

11   thing that is not -- if you look at what they say the

12   policies were when they answer and put a counterclaim in,

13   there is nothing in what they put in their response that

14   talks about us having to pay any of the claims costs.  What

15   they do is say, "Well, we put in the policy that you have to

16   comply with things that are in our other manuals or the

17   state stuff."

18          The standard here is pretty much:  Does the

19   average Joe think of the policy?  It's just not there.  And

20   they got on their horses after we took the 30(b)(6) and have

21   got these affidavits in.  But when I took their depositions

22   that are binding on them and said, "Where does it say we pay

23   the claims costs," they said, "It doesn't."

24          I think this is a dead issue.  Unless I can answer

25   any more questions, I tried to stay with the point.  I'll

1    sit back down.  Thank you, ma'am.

2              THE COURT:  Thank you.

3              On behalf of the Defense?

4              MS. MORRIS:  Thank you, Judge.  Mary Morris for

5    the Defendants and two of the counterclaimants.

6              Your Honor, this is not an individual insured.

7    This is a PEO, a professional employer organization that

8    runs multiple millions of dollars through these policies.

9    That exposure is what has to be insured or was insured, I

10   should say, by my clients.

11             We do not dispute that Sullivan II is an

12   additional named insured under the policies issued by

13   Guarantee.  I don't presume to speak for my colleague, but I

14   think the only policies at issue here are policies issued by

15   Guarantee Insurance Company.  So those are all the ones I'm

16   going to address.

17             It is absolutely a fact that --

18             THE COURT:  Is this Plaintiff a proper plaintiff

19   in this action?

20             MS. MORRIS:  Yes.  Yes, Your Honor, it is because

21   it's an additional named insured under the policies.  We

22   cite in our response where they appear in the endorsements

23   as an additional named insured.  There's no question about

24   that.

25             They are covered under the policies -- the '08,

'09, and 2010 policies.  However, that is a different thing

from saying that they can sustain a breach of contract claim

because they have been damaged.

THE COURT:  Let me ask you also about the

alignment of the Defendants.  Do you represent all of the

Defendants?

MS. MORRIS:  Yes, Your Honor, we do.

THE COURT:  Is the relationship a derivative of

Ullico -- or however it is pronounced -- and Patriot?  What

is the relationship among those three Defendants?

MS. MORRIS:  Of course, and I will be happy to

clarify that because it's a bit confusing.

Carriers have to be licensed and registered by the

various states in order to write business, their line of

coverage, whatever they're licensed for.  Guarantee is

licensed in some of those states.  And Ullico, which is in

Washington DC, which is a separate carrier altogether, is

licensed in other states.

Some time ago, they came to an agreement between

them that they could provide more comprehensive coverage

jointly for certain insureds with multi-state operations.

In other words, for a multi-state risk like Sullivan,

Guarantee would write coverage where Guarantee was licensed

to do so, and Ullico would write coverage where Ullico was

licensed to do so.

1          The parent company of Guarantee Insurance Company

2     is Patriot National.  There are a lot of Patriot entities,

3     but that is the parent company.  Ullico is an entirely

4     separate carrier.

5          There is, however, as I said, a contractual

6     relationship between it and Patriot that permits these

7     carriers to work in tandem to provide one comprehensive

8     insurance program for multi-state insureds.  And that was

9     done here.

10          THE COURT:  Throughout your responsive brief, you

11     cite Georgia cases.  I believe you mentioned in your status

12     report that it was Defendants' position at one time that

13     Florida law applied, but you cited all Georgia law.

14          Are you comfortable with the Court applying

15     Georgia law, or do you stand on your contention that Florida

16     law is applicable?

17          MS. MORRIS:  In total candor to the Court, I can't

18     prove that we delivered the policies -- where we delivered

19     the policies, I should say.  When an insured is represented,

20     as here, by a national insurance brokerage, like Gallagher

21     the carrier deals with the agent.  The carrier does not deal

22     with the insureds.

23          So it's no surprise to hear Mr. Savage say that

24     Guarantee didn't give them the policies because Guarantee

25     wouldn't deal with the insured.  Guarantee would give the

1  policies to Gallagher.  Gallagher is in Clearwater, Florida.

2          I cannot come before the Court right now, because

3  I don't have it, with evidence that they were delivered to

4  Gallagher in Florida.  But that is the normal course of

5  business for our clients.  They certainly weren't delivered

6  in Georgia to the insured because the carriers just don't do

7  that in the context of an agency like this.

8          THE COURT:  So the reason that you cite Georgia

9  law in your briefs is?

10          MS. MORRIS:  The reason I cite Georgia law in the

11  brief is because I can't establish Florida law with any

12  certainty.  But I can say that they would not have been

13  delivered to the insured up here.

14          In any event, the policies issued -- and as Your

15  Honor may have surmised from our response -- Workers'

16  Compensation is the most heavily regulated line of

17  property/casualty coverage in the country.  You cannot

18  provide Comp coverage pursuant to just a policy.  And it is

19  beholden on the agent to know this, which is somewhat

20  surprising given Mr. Petzold's affidavit.

21          The rating plan at issue here is incorporated by

22  the express language of the policy.  The rating plan has

23  loss reimbursement endorsements attached to it.  If the

24  insured, as we have briefed, does not elect an option under

25  the rating plan, a specific option providing for the payment

1  of allocated loss, adjustment expenses automatically

2  applies.  That is what is going on here.

3       The rating plan is a filed and approved document

4  pursuant to Mr. Kushler's affidavit in both Florida and

5  Georgia.  I added the rating plans to the affidavit for

6  those states particularly because that's where the bulk of

7  this exposure is.  There is exposure elsewhere, I believe in

8  South Carolina, but the vast majority of it is in Georgia

9  and Florida.

10      Those rating plans are regulator approved, and

11  they permit the carrier to write a large deductible program

12  in the way that this one has been written and to impose on

13  the insured the charges that have been imposed.

14      My colleague, Mr. Savage, is correct that at

15  deposition, our 30(b)(6) rep was asked, "Where is it in the

16  policy that the obligation to reimburse the carrier for ALAE

17  appears?"  It isn't in the policy.  It's in the rating plan

18  incorporated in the policy which is a publicly filed

19  document, and the agent should have known this and for some

20  reason did not.

21      And the question and the answer, as recited by Mr.

22  Savage, are correct.  We don't dispute that.  We said that

23  it isn't in the policy because it is not.

24      As to Mr. Petzold, the policy in this context is

25  the final embodiment of the parties' deal.  So what he has

1    to say about preliminary negotiations is legally irrelevant.

2            But aside from all that, there is a fundamental

3    misunderstanding of the nature of the coverage here because

4    this is loss sensitive coverage.  It may be a lot of money,

5    but it is a fraction of the cost of what is called standard

6    coverage, which is not loss sensitive.  And the reason it's

7    a fraction of the cost is because the insured contracts to

8    assume the risk of loss development by the reimbursement of

9    claims costs and expenses.  That's why.

10            That's how come the carrier can price it at, say,

11    30 or 40 percent of the cost of standard coverage.  If you

12    have a standard policy, which these are not -- well, they

13    started out on a standard policy, but in June of '08, they

14    switched over to loss sensitive coverage.

15            If you have a standard policy, the premiums are

16    based on the payrolls and the rates and the experience

17    modifier, and they are significantly higher because your

18    obligation to the carrier ends.  That is not this case.

19            Mr. Petzold, which is a matter of some concern

20    given that he's an agent, has confused unallocated loss

21    adjustment expenses with allocated loss adjustment expenses.

22    ALAE is claims dependent and is never a part of a fixed

23    premium -- never.  It cannot be because it's claims driven,

24    and one doesn't know what that is until the claims develop.

25            Unallocated loss adjustment expenses are another

1  matter, like the carrier's rent for the building and the

2  salaries and things like that.  That is what Mr. Kushler was

3  talking about.  Those are not passed on to the insured.

4  Those are absorbed by the carrier -- well, in the form of

5  standard premium.

6       THE COURT:  Let me make sure I understand

7  precisely what your argument is.  Stepping back from it, are

8  you arguing that your 30(b)(6) representatives are not in

9  conflict with what is contained in the documents?  Or are

10  you arguing that they were, but the documents, nevertheless,

11  control over their misunderstanding of legal conclusions?

12       MS. MORRIS:  Of course.  There is no conflict.

13  There is no inconsistency at all between their testimony at

14  deposition -- and there were four corporate representatives

15  presented for this deposition, Mr. Kushler among them who

16  filed this affidavit.

17       The reason there is no inconsistency is because

18  the questions at this deposition were all about what's in

19  the policy.  The problem is the policy incorporates the

20  rating plan.  And Workers' Compensation does this because

21  it's never written in a vacuum.  The manuals that are

22  incorporated in the policy that contain voluminous rules

23  published by NCCI, which is a state trading organization

24  along with Florida's, all of those are incorporated as a

25  matter of law and as a matter of policy construct in the

 1    insured's insurance program.

 2           The final word on the coverage and the

 3    determination of the parameters of the coverage is never had

 4    by resorting to a Workers' Compensation policy alone.  That

 5    is, perhaps, the piece of this that was missing at the

 6    deposition.

 7           Mr. Savage cites it absolutely correctly, the

 8    policy language for the proposition that it is the carrier's

 9    obligation to pay the claims, and it is.  And the reason for

10    this is because the carrier under the Workers' Compensation

11    Acts of the several states is liable for dollar one going

12    forward to conclusion of every Workers' Compensation claim

13    submitted under the policy -- every single one.

14           In other words, the insured doesn't chip in that

15    money to pay that claim.  The carrier starts out from dollar

16    one.

17           That is not to say, however, that the insured

18    under loss sensitive policies like these does not have an

19    obligation to pay it back pursuant to the rating plan that

20    is at issue here.  That is, I think, our fundamental --

21           THE COURT:  So you are saying that the 30(b)(6)

22    representative answered the question:  Is this contained in

23    the policy?  He said:  No.  And your position is that is

24    because the policy incorporates the rating plan, and it is

25    the rating plan that carries that.

 1            Why, if the rating plan is incorporated into the

 2  policy for that conclusion, why isn't it incorporated for

 3  the purpose of that answer?

 4            MS. MORRIS:  Because it's filed separately and

 5  approved by the regulators.  It's not a part of the policy.

 6  The corporate rep was shown a copy of the policy and asked

 7  to identify where it appeared, and it doesn't because no

 8  carrier ever attaches a copy of the filed and approved

 9  rating plan to the policy -- never, ever -- any more than it

10  would supply the insured or the insured's agent with NCCI

11  manuals that are five feet high.

12            These are ancillary tools for the regulators.

13  They would have to run this line of coverage to insure that

14  the carriers remain solvent.  And that's a real issue

15  because there's no dollar limit to claims.

16            And briefly touching on this subject, it is

17  absolutely developed case law in Florida that courts do not

18  get involved in these disputes.  Georgia, interestingly, has

19  almost the same statute we do with respect to --

20            THE COURT:  When you say "we do," you mean

21  Florida?

22            MS. MORRIS:  Yes, ma'am.  I'm sorry.  I'm from

23  Florida.  That Florida does.  And it just appears that the

24  case law hasn't been developed on the point quite as

25  extensively as it has in Florida.  But the statute is the

1    same, and the dispute resolution mechanism is the same.  And

2    the rationale is certainly the same because the regulators

3    have to run this line of coverage in order to insure

4    similarly situated insurers are treated the same.  The rates

5    are sufficient to provide for carrier insolvency, et cetera.

6         I think there is a procedural issue we have that

7    Your Honor was kind enough to clear up at the beginning as

8    to what count this motion is directed to.  It appears that

9    it's the contract count.

10        We bind coverage -- or I should say my clients

11   bind coverage pursuant to the directions of the agent.  And

12   the directions of the agent in this case specify that

13   several different entities as named insureds, including

14   Sullivan I and II.  And those communications are attached to

15   Ms. Cook's affidavit.

16        So that is why this coverage appears this way,

17   even though it is stated now, some years after the fact,

18   that Sullivan I doesn't exist.  The claims were reported in

19   the name of Sullivan I.  The experience -- in other words,

20   the claims experience that is required to be reported by the

21   carrier to NCCI was reported in the name of Sullivan I

22   because the employees were reported to be employees of

23   Sullivan I.

24        We don't have any evidence, and we looked, that

25   Sullivan II paid anything.  And obviously, damages are a

1    component of a contract claim.  I think this should have

2    been a dec action count inasmuch as the construction of the

3    policy is being requested.

4         But if it is predicated on a contract count, then

5    I do not see that a contract count can be sustained, absent

6    some evidence that damages have suffered.  Being billed for

7    these charges, however one wants to account for them, is not

8    sufficient to sustain damages for a contract claim.

9         THE COURT:  Was Sullivan I billed for the ALAE?

10         MS. MORRIS:  Sullivan Administrative Managers,

11    LLC -- which I'm not fixed on this in my own mind -- appears

12    to be an umbrella or some sort of parent entity.  Perhaps

13    Mr. Savage can explain this better -- was billed.  And I

14    believe the affidavit of Ms. Grandmaison -- and I don't have

15    that in front of me -- establishes which entity was billed.

16    It also says that we don't have a record of billing Sullivan

17    II or getting money from Sullivan II for claims costs.

18         THE COURT:  That was my next question, whether

19    Sullivan II has ever paid.

20         MS. MORRIS:  We have gotten in discovery and

21    attached to our response documents that Mr. Savage was kind

22    enough to produce what seems to be an internal printout from

23    Sullivan Administrative Managers, LLC as to payments.  And

24    that would comport with how we issued our invoices and

25    deductible billings.

1           There are a couple of different bills that go out

2   on a program like this.  They are audited premium invoices.

3   There are deductible summary invoices.  And then attached to

4   that is a monthly loss run that deals with the claims

5   development that supports the deductible invoice.

6           Patriot issued some of these.  Guarantee issued

7   some of these.  But we cannot find in any instance where we

8   issued them to Sullivan II.

9           THE COURT:  Do you anticipate filing a dispositive

10  motion on behalf of the Defense?

11          MS. MORRIS:  We do, Your Honor.  Of course, within

12  the Court's deadline for that, we have a couple.  We have a

13  motion coming on behalf of Ullico, which is not a carrier in

14  the context of these policies, although it is in Florida, as

15  I mentioned early on.  And Patriot because Patriot is a

16  parent.

17          The party dealing with Sullivan's agent for the

18  procurement and the maintenance of Sullivan's insurance

19  program was Guarantee.  And so of the four --

20          THE COURT:  You anticipate filing a dispositive

21  motion on behalf of that Defendant?

22          MS. MORRIS:  I hope to by next week.  And there is

23  also the -- we anticipate probably filing a motion for

24  summary as to our counterclaim which will, surprisingly,

25  look much like our response to this motion because the

1    premium is based on a rating plan.

2              THE COURT:  All right.  Thank you, ma'am.

3              Mr. Savage, anything in reply?

4              MR. SAVAGE:  I'll be two minutes or less.  I think

5    you asked the dispositive question, which is when I asked

6    them whether ALAE, which are these allocated losses, are in

7    the policy, these are very savvy people.  The fellow who

8    came up from Florida has been in this Workers' Comp business

9    for thirty-five years.  His answer should have been, "It is

10   in the policy by references, Mr. Savage.  We refer to these

11   other things."

12             It's almost a stunning position that they take to

13   ask you to say, "We admit it's not in the policy, but we

14   want you to say that's okay."  The complete answer should

15   have been, "It is in the policy by reference."  And that was

16   never said to us, and we were talking about ALAE.

17             We went to the lengths that I know that Martin and

18   Neff McIntosh can go, who are the principals of Sullivan

19   Staffing.  And it's in the record, an email from their

20   representative, Skylar Rupp, saying -- it's not just us

21   saying through Mr. Petzold that these claims costs aren't

22   paid.  We have an email back from their representative,

23   Skylar Rupp, saying, "You're right.  They're not covered."

24             It is almost overwhelming evidence in this case

25   that these costs are not covered in any way, shape, or form.

```
 1              Ms. Morris is a good person to deal with, but I
 2   think I'm getting hammered a little bit on the discovery.
 3   We asked them for the billing invoices, and they took the
 4   position that "Well, you don't have the right plaintiffs so
 5   we're not going to send the billing invoices in this case."
 6              THE COURT:  Is that correct, Ms. Morris?
 7              MS. MORRIS:  Perhaps if I could see my response,
 8   Judge?  I'm not sure what --
 9              MR. SAVAGE:  Do you have it?  We asked for it, and
10   you sent us --
11              MS. MORRIS:  I'm not saying that they didn't.  I'm
12   just saying I can't remember.
13              THE COURT:  Let's leave it at that.
14              MR. SAVAGE:  And things like Ullico, I'm happy to
15   sit down with them.  I don't want them to spend a bunch of
16   money on legal fees.  This is tough to figure out.
17   Ullico -- and Patriot, I know, is the holding company.  I'll
18   sit down with them.  And if I don't have a claim against
19   them -- after I met them, I didn't think I could stand in
20   good faith and say these guys are racketeers.  So I said,
21   you know, "Let me get rid of it."  I don't like doing that.
22              Let me say one last thing, and then I'm going to
23   sit down.  They don't say in their answer that Sullivan
24   Management II is an additional insured.  They say the
25   policies were issued.  When we say -- were issued to
```

```
1    Sullivan.  Sullivan always in these answers is Sullivan
2    Management II.  They say they were issued to them in this
3    case.
4            It's a little disingenuous where we get in these
5    situations saying that "Yeah, they have a claim possibly."
6    But when I read their response, they're saying, "He swung
7    and missed.  He's got the wrong party.
8            I thank you for your time.
9            THE COURT:  Thank you, counsel.  I will look for
10   further briefing then or further dispositive motions.
11           MR. SAVAGE:  Right.
12           THE COURT:  I anticipate being able to decide
13   those on the paperwork.
14           Anything further for today's purposes?
15           MR. SAVAGE:  I don't know if the Court is
16   interested.  We have tried to talk about resolving it, and I
17   think this Court and its predecessor is good at resolving
18   things.  I don't know if that's something you want to take
19   up today or another day or if we're in a position to do
20   that.  I'm just throwing that out.
21           MS. MORRIS:  He's right to throw it out.  I credit
22   Mr. Savage with utter civility and professionalism.  We did
23   have a lot of time after these depositions.  And it's my
24   fault.
25           I have not been prepared until today to begin
```

1    meaningful discussions.  I am in possession of some numbers,

2    and I believe this should be worked out.  And we'll

3    certainly attempt to do that.  If there is an issue with

4    Patriot and Ullico, we can hopefully resolve that, short of

5    the motion-by-motion practice.  We are going to try.

6                THE COURT:  You are just about to embark on a

7    whole lot more legal work that will encompass a lot more

8    expense for everyone.  If the case in total stands any

9    chance of perhaps a resolution that everyone could agree

10   upon, now is the time to explore that.

11               I will put out that if the parties are interested

12   in scheduling a settlement conference with the Court, I

13   would be more than happy to try to facilitate that.  Think

14   about that and talk with your clients about it.  If so,

15   let -- my usual courtroom deputy was called away just a few

16   hours ago.  But Elizabeth Nelson, call her let her know.

17   And we can push back the dispositive motions deadline to

18   explore settlement if that is a real possibility.  Consult

19   with your clients, and let Elizabeth Nelson know if that is

20   a course that might prove fruitful.

21               MS. MORRIS:  I will, Your Honor.

22               THE COURT:  All right.  We will be in recess.

23       (Recess at 2:48 p.m.)

24

25

1                          CERTIFICATION

2

3           I certify that the foregoing is a true and correct

4    transcript of the stenographic record of the above-mentioned

5    matter.

6

7

8

9    _____        March 20, 2013
     Norma Hatfield, FPR, Court Reporter
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25