UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION


SULLIVAN'S ADMINISTRATIVE     :        Case No. CV412-212
MANAGERS II, LLC,             :
                              :
          Plaintiff,          :
                              :
vs.                           :
                              :
GUARANTEE INSURANCE COMPANY,  :
ULLICO CASUALTY COMPANY, and  :
PATRIOT NATIONAL INSURANCE GROUP, :
INC.,                         :        Savannah, Georgia
                              :        May 8, 2013
          Defendants.         :        11:35 a.m.
_____:


MOTIONS HEARING
BEFORE THE HONORABLE LISA GODBEY WOOD
United States Chief District Judge

_____


Reported By:            Norma Hatfield, FPR
                        Official Court Reporter
                        801 Gloucester Street, Rm. 216
                        Post Office Box 1316
                        Brunswick, Georgia 31521-1316
                        (912) 262-2608 or (912) 262-9989
                        normah3@comcast.net
                        Norma_Hatfield@gas.uscourts.gov

```
APPEARANCES:


For the Plaintiff:        BRENT J. SAVAGE, ESQUIRE
                          JAMES KYLE CALIFF, ESQUIRE
                          Savage, Turner, Pinckeny & Madison
                          Post Office Box 10600
                          Savannah, Georgia 31412
                          (912) 231-1140
                          bsavage@savagelawfirm.net


For the Defense:          MARY O. MORRIS, ESQUIRE
                          Morris & Morris, PA
                          777 S. Flagler Drive
                          Suite 800 - West Tower
                          West Palm Beach, Florida 33401
                          (561) 838-9811
                          momorris@morris-morris.com

                          JOHN V. BURCH, ESQUIRE
                          Bovis, Kyle & Burch, LLC
                          200 Ashford Center North
                          Suite 500
                          Atlanta, Georgia 30338-2668
                          (770) 391-9100
                          jvb@boviskyle.com
```

3

```
 1                    P R O C E E D I N G S

 2               (Call to Order at 11:35 a.m.)

 3          THE COURT:  Miss Nelson, call the case.

 4          THE CLERK:  Sullivan's Administrative Managers,

 5   LLC versus Guarantee Insurance Company, Ullico Casualty

 6   Company, and Patriot National Insurance Group Incorporated.

 7   Brent Savage and James Califf for the Plaintiffs.  John

 8   Burch and Mary Morris for the Defense.

 9          THE COURT:  Ready for the Plaintiffs?

10          MR. SAVAGE:  Yes, Your Honor.

11          THE COURT:  Ready for the Defense?

12          MS. MORRIS:  Yes, Your Honor.

13          THE COURT:  Counsel, we have met before in this

14   case down in Judge Edenfield's courtroom.  At that time we

15   had the motion to dismiss and the motion for summary

16   judgment, the initial one filed, and we resolved the motion

17   to dismiss there.

18               Now joining that original motion for summary

19   judgment are several other motions that were timely filed.

20   I wanted to meet with you this morning to visit with you

21   some questions that have developed with the filing of those

22   documents and hear anything more that you want to say before

23   I go ahead and resolve the pending motions that will lead us

24   either to a trial or to wrap it up with the motions.

25               Let me take up, first, the more discrete ones, and
```

1    that is Defendant -- I guess you say Ullico's -- motion to

2    stay.  I do not see any opposition to that motion.  It is my

3    understanding that they are insolvent and a receiver has

4    been appointed.

5           Is there any reason not to stay the case as to

6    them?

7           MR. SAVAGE:  We're going to let them go.

8           THE COURT:  All right.  So, Mr. Savage, if you

9    will file the appropriate pleadings.

10           MR. SAVAGE:  I will.

11           THE COURT:  And that will be the end of that

12    Docket Number 58 motion.

13           I believe the Plaintiffs had a motion to compel

14    interrogatory responses.  Has that been resolved or is that

15    still under contention?

16           MR. CALIFF:  I was under the impression that the

17    Court issued an order on that.

18           THE COURT:  It is my understanding that it has

19    been resolved.  Is that --

20           MS. MORRIS:  Your Honor, it was resolved.

21           THE COURT:  All right.  So as to Dockets Number 67

22    and 76, all discovery issues are now resolved; is that

23    correct, counsel?

24           MR. CALIFF:  I believe so.  I think we just need

25    -- do we have all the numbers that we requested as to how

1    much we were charged in this case?

2          MS. MORRIS:  If I may respond?

3          THE COURT:  Yes.

4          MS. MORRIS:  The motion to compel was denied as

5    untimely under the Court's local rules.

6          THE COURT:  Are there any pending discovery issues

7    remaining?

8          MS. MORRIS:  No.  No discovery issues per se.

9    Perhaps there will be something down the road depending on

10   what happens.

11         THE COURT:  So Docket 67 and 76.  Any discovery

12   issues that could have arisen thus far are out of

13   contention.

14          As for the more weighty motions that are pending,

15   I did have some questions for each of you.  Let me begin

16   with the Plaintiff.  Mr. Savage, are you going to speak on

17   behalf of your client?

18         MR. SAVAGE:  Yes.  Mr. Califf may have some things

19   that I don't, but I'm here.

20         THE COURT:  All right.

21         MR. SAVAGE:  I even have Mr. McIntosh here.  It's

22   his last appearance in Savannah before he moves to

23   Asheville, who is very knowledgeable.  He's a client, not a

24   lawyer.

25         THE COURT:  All right.  Mr. Savage, the difference

1    in what I call SAM, Sullivan's Administrative Managers, SAM

2    I and SAM II, it is my understanding that the related

3    litigation between SAM I and the Defendants is ongoing in

4    Florida.  Is that --

5              MR. SAVAGE:  Ms. Morris would be better on that

6    than me.  We have local counsel in Florida, and I'm not in

7    that case.  I don't think much is going on, but she can

8    answer that better than me.  I think they basically laid it

9    aside.

10             THE COURT:  What is the --

11             MS. MORRIS:  Thank you, Mr. Savage.  Your Honor,

12   the status of that is that -- Mr. Savage is correct --

13   nothing much is going on; that we were unaware of the

14   pendency of the insolvency and the state of Ullico Casualty.

15   That insolvency order entered, I believe, March 11th.  And

16   Ullico Casualty is a plaintiff in that case against what we

17   call SAM I.

18             THE COURT:  One.

19             MS. MORRIS:  Right.  That case was filed before

20   this case was filed.  However -- and Ullico, by the way, is

21   a joint plaintiff, Your Honor, against SAM I.  SAM I, I

22   believe, is the only defendant.

23             But counsel for Sullivan's down there, Mr.

24   Salzman, and I have not prosecuted that action, and we are

25   certainly not doing it now because of the insolvency order.

1   So it is sitting there.

2          THE COURT:  It is SAM I in the Florida case,

3   correct?

4          MS. MORRIS:  Yes, ma'am, it is SAM I in the

5   Florida case as the defendant.

6          THE COURT:  The Plaintiff asserts in their reply

7   brief that there really is not a SAM I; that SAM I does not

8   exist.  Has there been efforts made to substitute in SAM II,

9   or what is --

10          MS. MORRIS:  In Florida, Your Honor, there have

11   not been.  The policy's principal named issued is SAM I, as

12   we call it.  There are multiple -- given that this is a PEO,

13   a professional employer organization, there are multiple

14   additional named insureds of which SAM II is one.  There are

15   many other client companies the PEO business.

16          We have to sue in contract in the name of the

17   principal named insured.  We could have admittedly under

18   Florida procedure sued all of the additional named insureds,

19   which would have probably numbered in the couple of hundred.

20   But to avoid that, given that that would have been very

21   unwieldy and expensive, we just sued the principal named

22   insured, SAM I.

23          This comes about pursuant to the binding

24   instructions from Arthur Gallagher.  Greta Cook filed an

25   affidavit in this case -- she is our underwriter -- in which

1   several specifically named insureds were conveyed to the

2   underwriter at Guarantee by Barbara Norman at Arthur

3   Gallagher who said, among other things, that SAM I needs to

4   be a named insured.

5          THE COURT:  I'm sorry, why don't you approach the

6   podium?  I really cannot hear you.

7          MS. MORRIS:  What happened was when coverage -- is

8   that better, Your Honor?  When coverage was being bound,

9   Guarantee was not dealing with the insured.  It was dealing

10  with the insured's agent, Gallagher, in Clearwater, Florida.

11         Barbara Norman of Gallagher said in an email that

12  is attached to Ms. Cook's affidavit, "Bind coverage for the

13  following entities," of which SAM I was one along with, I

14  believe, SAM II.  That email is attached to the affidavit in

15  this case.  I brought it.  But SAM I was identified as a

16  named insured for which coverage had to be bound.

17         That's why the policy is issued that way, pursuant

18  to the binding instructions of the agent.

19         THE COURT:  Is it your position that the case in

20  Florida is against, essentially, the same SAM as this case?

21         MS. MORRIS:  I'm not going to say yet.  We haven't

22  undertaken discovery down in Florida, save a request to

23  produce, I believe, many of which were objected to.  It

24  appears that there was a mistake in the binding instructions

25  from the agent, but that is the way the policies were

1    written.  And beyond that, the experience was reported to

2    NCCI in the name of SAM I.

3              THE COURT:  If it is, in fact, a scrivener's error

4    or mistake of some sort and the case in Florida is between

5    the same parties for the same issues, should this case be

6    stayed pending the Florida case?

7              MS. MORRIS:  Well, that is an issue.  There is a

8    First Filed Rule, of course, and the Florida case was filed

9    first.  It is the Plaintiff's position in this case that

10   there is no Plaintiff such as in the Florida case, SAM I.

11   But there has never been an amendment to the pleadings in

12   this case to the effect of Plaintiff SAM II, a/k/a SAM I,

13   a/k/a Sullivan's Administrative Managers, LLC.

14             There are various Sullivan entities.  I'm sure Mr.

15   Savage will speak further about this.  But in this

16   particular case, they are proceeding only in the name of SAM

17   II.  If it is the same entity, and it appears to have the

18   same EIN, and Mr. McIntosh has testified that there is no

19   such entity as SAM I, the named insured on the policies,

20   then perhaps something will have to be done in Florida,

21   which again is not being done now because of the stay order.

22   Ullico has the bulk of that obligation down there.

23             THE COURT:  That something to be done in Florida

24   would be?

25             MS. MORRIS:  It would be an amendment to the

1  pleadings.  Sullivan I, a/k/a Sullivan II, a/k/a Sullivan

2  Administrative Managers, what have you, once we were to get

3  a grip on what the inner relationship is.  There is a

4  parallel entity that's just the basic LLC, as I understand

5  it.  There's one, there's two, there's one other one, I

6  believe, by the name of Sullivan.  It's not just one entity.

7          The issue that we have, though, again, is the

8  binding instruction from the agent.  And we've read it the

9  way it was instructed.

10          THE COURT:  Regardless of the instructions from

11  the agent, I am not inclined to let this case sort of sit

12  around for faceless people in Florida to perhaps take

13  certain steps to move the case.  The only one before me is

14  this one, and it needs to be brought along.  They never get

15  better by waiting.

16          MS. MORRIS:  I don't suggest that Your Honor

17  should wait.  That's why we haven't moved for a stay.

18          THE COURT:  Nevertheless, we also have to respect

19  the relevant rules.

20          Let me, Ms. Morris, while you are at the podium,

21  go ahead and address some other questions that I had

22  regarding the pending motions.  Let me ask you about choice

23  of law.  Is it Florida law that you maintain applies?

24          MS. MORRIS:  Not for the tort claims, Your Honor.

25  Under the law, as we've determined it that I think applies,

1   the law of the jurisdiction where the harm occurred in the

2   context of a tort claim applies.  Sullivan is here.  As

3   regards disposition of Sullivan's tort claims, that would be

4   Georgia law.  Now --

5           THE COURT:  The contract claims?

6           MS. MORRIS:  Contract is different.  This is,

7   candidly, an issue.  It is business practice that insurance

8   policies for commercial risks like this are delivered to the

9   agent.  That agent is in Florida.

10          I cannot produce to my opponent and this Court a

11  certified letter or an email that proves that these policies

12  were sent to the agent; and they, similarly, cannot produce

13  anything that says that they weren't.  If they were sent to

14  the agent in Florida, then *Mid-Continent v Basdeo*, Middle

15  District of Florida, indicates that Florida contract law

16  would apply.  That is not something I'm able, in all candor,

17  to establish.

18          So we have briefed these motions and have

19  proceeded in this manner pursuant to Georgia substantive law

20  with respect to the contract issues.  I'm not willing to

21  concede that it applies over all because I am preserving

22  that argument in Florida.

23          THE COURT:  The main claims and the counterclaims

24  would be governed by the same state's law, correct?

25          MS. MORRIS:  Georgia law, yes.  And it's briefed

 1   as such.

 2          Having said that, Sullivan is a multi-state

 3   exposure risk.  It has a great deal of exposure in Florida,

 4   which is why a motion to dismiss for improper venue down

 5   there was denied.  It also has South Carolina exposure, it

 6   is true, but I believe the vast majority of that exposure is

 7   in Georgia.  Its operation is not confined to Georgia.

 8          THE COURT:  Do the Defendants win as a matter of

 9   law if the ratings plan was not incorporated into the

10   policy?

11          MS. MORRIS:  Yes.  The reason it does is because

12   then the policy alone and the regulatory manuals that it

13   refers to in the general section -- and by the way, I have

14   brought them with me.  I've brought them, and I'm prepared

15   to leave them with the Court if the Court wants to review

16   them.

17          The general section, which is written by NCCI,

18   which is the rating organization for here and Florida and

19   thirty-seven other states, I believe, indicates that the

20   premiums and various other issues, like rating, will be

21   dealt with by reference to the manuals.  And manuals are

22   incorporated in every workers comp policy by operation of

23   the standard general section.

24          That general section also refers to rating plans

25   with respect to the determination of premium.  If it had

1   been written differently, if it did not include the rating

2   plans, then yes, Sullivan wins.

3             THE COURT:  It is incorporated by operation of

4   what?

5             MS. MORRIS:  The language in the general section

6   of the standard workers compensation policy.

7             THE COURT:  Can you point me to that language?

8             MS. MORRIS:  May I get my --

9             THE COURT:  Yes.

10            MS. MORRIS:  I apologize, Your Honor.  There is a

11  lot of paper.  (Pause)

12            Your Honor, I do apologize.  (Pause)

13            Okay, Your Honor.  I'm sorry for the delay.  I'm

14  sorry, counsel.

15            MR. SAVAGE:  No problem.

16            MS. MORRIS:  In the policy's general section --

17  and the policy is of record in this case -- it is docket

18  entry 48-1, page 4, is where the reference language is

19  cited.  It's Subsection A, "Our Manuals."  It says:

20            All premium for this policy will be

21            determined by our manuals of rules, rating

22            plans and classifications.  We may change our

23            manuals and apply the changes to this policy

24            if authorized by law or a governmental agency

25            regulating this insurance.

 1          And that language is in the policies which are of

 2    record.

 3          THE COURT:  Right.  And that is the sentence that

 4    I thought you were keying off of.  I am just not sure how

 5    anyone is to know what is referred to when the policy says

 6    "ratings plans."

 7          Where is the ratings plan, and if you are in their

 8    seat, how do you go about and look at it?  How do you know

 9    what Option A and Option B is, and how are you to pick

10    Option B?  What is that process?  What were they to have

11    done if they scoured the document and found that sentence

12    and thought, "Oh, let me look to the ratings plan"?  Where

13    would they go?

14          Walk me through that process.

15          MS. MORRIS:  This is why many jurisdictions

16    commend these sorts of disputes to the regulators.  The

17    process is that the rating plan is filed and approved, in

18    this case applicable to policies, I believe, effective after

19    July 1st of 2003, at least I know that date applies to

20    Georgia.

21          The rating plan is public record.  This is a large

22    commercial insured.  This is not an individual trying to get

23    a car accident --

24          THE COURT:  Let's say they are a large commercial

25    insured, not a little, short, old woman.  Let's say they are

1   a large commercial insured, which they are.  Again, my

2   question is:  How do they go and find this and pick Option B

3   over Option A?

4         MS. MORRIS:  They rely on their agent.  The agent

5   is supposed to know.  It is unexplained why that was not the

6   case here.

7         THE COURT:  Where does the agent go and pick

8   Option B over Option A?

9         MS. MORRIS:  The agent discusses it with the

10  carrier.  The agent is supposed to inform the insured of the

11  elections available under the rating plan.  The agent is

12  suppose to have a copy of the rating plan.  If the agent

13  doesn't, the agent is supposed to ask the carrier.

14        THE COURT:  In all of these suppositions -- that

15  you are supposed to rely on this person, and this person is

16  supposed to know these things -- where are all these

17  suppositions documented?  How am I to -- other than the fact

18  that you have come here, obviously an honorable woman --

19  what do I cite for those suppositions?

20        MS. MORRIS:  Your Honor cites to Georgia law that

21  is also true in Florida.

22        THE COURT:  Give me that O.C.G.A. cite about where

23  you find these ratings plans.  What law do I cite for this

24  person was supposed to do this and this person -- what

25  O.C.G.A. cite are you relying on?

1          MS. MORRIS:  I'm not relying on an O.C.G.A. cite.

2    I'm relying on the general kind of law that the agent is the

3    agent of the insured for this proposition; that it's the

4    agent's job to know the parameters of the coverage it's

5    selling for which it gets a commission when it places it.

6          THE COURT:  And the ratings plan that was their

7    job under Georgia law to know, where is that duty?

8          MS. MORRIS:  I don't have a cite other than the

9    general duty of care and knowledge that inheres in the

10   pursuit of any profession.

11         THE COURT:  Where would he or she find Option A

12   and Option B?  How would they access it?

13         MS. MORRIS:  It's easy enough via a telephone call

14   to the Offices of Insurance Regulation in Florida or, I

15   believe, it's the Commissioner of Insurance here, or through

16   the carrier.  These things have been filed for a very long

17   time, and they are available.  And they are specifically

18   referenced in the policies, along with the NCCI manuals,

19   which also are available from NCCI.  By the way, I think

20   that those are filed with the Offices of the Insurance

21   Commissioner of the Insurance Regulations.

22         THE COURT:  So is that where they should have gone

23   to find Option B?

24         MS. MORRIS:  For the rating plan, they could have

25   asked us to send a copy.  We certainly have it.  We've

1    produced it in this litigation.  They could have gone to the

2    commissioners of Florida or Georgia.  It is an acknowledged

3    fact of this line of property casualty coverage that this is

4    a regulated line and that the coverage and the obligations

5    on the carrier are not confined to the policy but by state

6    regulatory filings and NCCI manual rules.  And people who

7    know this line of coverage know that.

8            THE COURT:  All right, Ms. Morris.  Is there

9    anything that you want to add to your written product this

10   morning?

11           MS. MORRIS:  No, Your Honor.  I would like to

12   thank Mr. Savage for agreeing to dismiss Ullico, first of

13   all.  But everything that we had wished to say, that we've

14   been given an opportunity to say, we have said in our

15   briefs.  They are voluminous.

16           We do believe that the arguments necessitate the

17   conclusion that our client cannot be sued pursuant to the

18   claims made in the Complaint.  That is the only thing that I

19   would wish to reiterate very strongly to the Court, is that

20   we are bound by the pleadings in this case.  There are four

21   claims for breach of contract, negligence, fraud, and

22   conversion.  We do not believe under any construction of

23   this state's substantive law that those claims can be

24   maintained on the law or the facts as plead that underlie

25   them.

1           And it is too late now -- no amendment to the

2     pleadings has been made -- to argue against motions by

3     advancing new theories or new claims.  We are bound by what

4     we have alleged in the pleadings, and I believe that

5     Mr. Savage has pointed that out in response to one of my

6     motions, in fact.  And based on the Complaint that was

7     removed to this Court, I don't feel those claims can be

8     sustained.

9           THE COURT:  All right.  Thank you, Ms. Morris.

10          All right, Mr. Savage, on behalf of the Plaintiff.

11          MR. SAVAGE:  The best lawyer I ever dealt with is

12    a guy from Toledo, Ohio, Willis Jones, and he used to talk

13    to my clients on depositions and say, "Are you a real world

14    guy?"  And he meant it kind of sticking a knife in our side.

15    But what they propose is out of this world.

16          First of all, Martin Sullivan is not a huge

17    insured.  He's a guy.  He and Neff are Sullivan.  They're

18    not huge.  But what we are hearing from Ms. Morris is "You'd

19    better go to Atlanta, you'd better go to Tallahassee, you'd

20    better go to Columbia, South Carolina, pull down all these

21    rate books."  They didn't produce them in this case until

22    they filed their motion for summary judgment.

23          That's not the real world, and that's what they're

24    asking you to adopt, that this Court puts its stamp on the

25    insureds, the small businessmen of this country, that you'd

1   better go to each insurance regulator and read what's in

2   there.  And they may change them in the policy.  That's not

3   right.

4             One of the reasons that's not right is they never

5   produced the policies to us.  This is outrageous to come in

6   and say, "You owe us all this money."  And Ms. Morris is a

7   straight shooter.  I was happy to hear her say, "We can't

8   show that we ever gave your agencies policies in this case."

9             I would differ with her, though, to say that we

10  have not shown that we never got them.  Martin Sullivan

11  testified -- and he would like to be here today, but I'm

12  glad he's not because he's had a stoke and it's probably not

13  good for him to be around too much of this controversy.  But

14  Neff can handle all that stuff.

15            But he's testified he never got them.  Mr.

16  McIntosh has testified he never got them.  And Mr. Petzold,

17  who's our agent, testified that he never recalls receiving

18  any of them.  They keep track of when policies are

19  delivered.  He went back and checked the records of

20  Gallagher, and none of them were delivered.

21            So to try to assert these defenses when you don't

22  satisfy the requirements that you deliver the policy even

23  makes it more ludicrous than the suggestion that everybody's

24  got to go up to Atlanta and read all of these books about

25  what the rates are.  That's not the real world.

1            If we look at the policies, we agreed to pay the

2      benefits to these folks.  But we never agreed to pay any

3      costs, which are these huge claims adjustment costs.

4            And this crowd is slick.  What they do is they

5      initially form a subsidiary which is going to be the nursing

6      care subsidiary where you're going to have a nurse manager

7      on every comp claim.  The initial cost is a hundred bucks.

8      You could cut your finger at your old job, and you had comp

9      with the law firm, and they just assign $100 fee to your

10     claim and you could be back at work in half an hour.  But

11     they're going to pay themselves with that.  Now they got

12     wise and separated that out.

13           But these are good New Jersey businessmen.  When

14     you don't produce the policy, they shouldn't be able to

15     stand behind it.

16           I think the right remedy here -- and I understand

17     your concern about two actions -- is that there should have

18     been a motion to dismiss this action based on prior suit

19     pending, or there should have been a motion to stay in this

20     court, because if this is the second one, which we don't

21     believe it is -- every one of these policies is written on

22     SAM II's tax ID number.  There is no SAM I.  They can't show

23     there is a SAM I.

24           But the remedy would have been to file a motion to

25     stay or a motion to dismiss.  I'm not a big out-of-time guy.

```
 1   I mean, I sit here, and it happens to me constantly.  I
 2   guess I ought to wise up.  But we try to work with the other
 3   side.  We say, "Can we get these documents?"  We lose track
 4   of them.  And then we file motions late, and they say,
 5   "Well, you didn't do it on time."  You try to work with the
 6   other lawyers.  I've got one of those in a maritime case
 7   now.
 8          But, you know, they don't get summary judgment,
 9   and this does not make sense.  And I was happy to hear her
10   say that Sullivan wins if you don't incorporate those
11   manuals up there.  And we win.
12          THE COURT:  Let me hear you a little bit further
13   on the SAM I and SAM II business.  Is it your position that
14   the Florida case essentially involves the same parties?
15          MR. SAVAGE:  No.  There is no SAM I.
16          THE COURT:  It is your position steadfastly that
17   there is no SAM I in reality --
18          MR. SAVAGE:  No.
19          THE COURT:  -- and that your SAM II is the only
20   viable entity involved?
21          MR. SAVAGE:  Right.  I mean, it was a tactic.
22   When Martin and Neff came to me to start with they said
23   there was no SAM I.  I said, "We're going to have prior suit
24   pending problems if it's the same company."  They said,
25   "There is no SAM I."  I said, "Well, in that case, why don't
```

 1   we file on our home turf?"  And I filed, I guess, in state

 2   court.

 3          THE COURT:  Let me ask you the converse of what I

 4   asked Ms. Morris.  Does your client win as a matter of law

 5   with respect to the breach of contract claims if the ratings

 6   plan, including Option A, was incorporated in the policy?

 7          MR. SAVAGE:  We still win because the policy that

 8   they write says, "All we pay" -- "we" pay, POE --

 9          MR. CALIFF:  PEO.

10          MR. SAVAGE:  PEO?  I got the acronym wrong?  PEO.

11   I don't know what's worse, the insurance business or the

12   military with acronyms.  But PEO.

13          We still win because all we obligate ourselves to

14   pay is the benefits not the costs.

15          THE COURT:  Two more issues.  Let me direct you

16   back.  Is it Mr. Kushler or Kushler (different

17   pronunciation)?

18          MS. MORRIS:  Kushler, yes, ma'am.

19          THE COURT:  Is that a dispute of fact between what

20   he originally testified to and what he later cleared up?

21   Let me hear from you first.

22          MR. SAVAGE:  I think it is.  I mean, I think you

23   cannot modify your testimony with an affidavit later, and

24   the least favorable to those Defendants is to be taken.  And

25   we felt that he conceded basically what Ms. Morris said that

1   we win, although, look, they point to an endorsement that

2   we've got to go to Atlanta and Tallahassee and Columbia and

3   read all these books to get it from.

4          That's preposterous, but I don't know how you do

5   it if you never get the policy and your agent never gets the

6   policy.  That's a pretty neat game where you don't produce

7   anything and then try to hold people's feet to the fire.

8          THE COURT:  And Ms. Morris contends I should use

9   Georgia law for any kind of tort-related claims and Florida

10  law for breach of contract.  Is that a fair summary?

11         MS. MORRIS:  Your Honor, we contend that Georgia

12  law applies to the tort claims, and we are arguing --

13  briefing, rather -- that Georgia law also applies to the

14  contract claims, because in all fairness -- and Mr. Savage

15  is right -- I cannot establish in the form of evidence right

16  now that we had delivered the policies in Florida, although

17  that is customary business practice when the insured's got

18  an agent.

19         THE COURT:  And, Mr. Savage, is that your

20  contention, that Georgia law would apply across the board to

21  all of the contracts --

22         MR. SAVAGE:  Right, right.

23         THE COURT:  -- and tort?  All right.

24         Anything further on behalf of the Plaintiff?

25         MR. SAVAGE:  No.

 1            THE COURT:  Anything further on behalf of your

 2   client?

 3            MS. MORRIS:  If I may briefly, Your Honor?

 4            THE COURT:  Yes.

 5            MS. MORRIS:  We do feel that this is a regulatory

 6   matter.  The problems that are evident are not actually

 7   confined to this insured.  Many insureds, commercial and

 8   otherwise, have trouble in dealing with the comp policy

 9   because it's so highly technical and heavily regulated.

10            Because it is, and because it involves state-

11   approved forms and state-approved endorsements, regulatory

12   rules -- and I can leave these books with Your Honor, if you

13   want them -- it is exceedingly extraordinarily complex.  It

14   involves actuaries.  It involves a bunch of people working

15   in an entirely separate organization to figure out the rates

16   and the experience rating and the premiums and deductible

17   credits that they will allow to make sure that the carriers

18   don't go under, to make sure that similarly situated

19   insurers are treated the same.

20            It is a regulated line, and the carriers don't

21   have a lot of discretion with respect to how they write this

22   coverage because of that.  They can't deviate from filed

23   rating plans; they can't deviate from filed and approved

24   rates, which are two different things.  They can't deviate

25   from the experience modifier that NCCI assigns to the

1    insured.  They can't.

2           Many, many people don't understand this, be they

3    insureds or agents.  This insured had one of the biggest,

4    Gallagher, not a small little local agent.  So it is with

5    dismay that I see these issues arise again and again and

6    again.

7           We do think that it is appropriate at this

8    juncture in Georgia's jurisprudence that it adopts this

9    rule, that it adopts that these kinds of disputes go before

10   the regulators.  Georgia does not have a case on point.

11          THE COURT:  Is that what you are urging this Court

12   to do?

13          MS. MORRIS:  Yes, I am.

14          THE COURT:  To say that this is so highly

15   regulated that we are just going to set aside the Seventh

16   Amendment and just send it to a regulating body?

17          MS. MORRIS:  Yes.  That is the rule with respect

18   to administrative review.  There is no case in Georgia

19   common law that says when an insured disputes a workers

20   compensation premium or the application of another rating

21   rule or regulation that it has to pursue the administrative

22   process and exhaust those remedies.  It ultimately does get

23   judicial review, but that is in the Court of Appeals.

24          There is no Georgia case law that says that.

25   There are a lot of cases in other jurisdictions that say

1   that, and that is the weight of authority.  For a federal

2   court to opine on what a Georgia state court would do when

3   the Georgia state courts have not ruled on this issue would

4   entail a best guess, which, of course, the federal courts

5   may decline to make.  I understand that.

6            But these cases can't be litigated like regular

7   contract claims.

8            THE COURT:  You are keying off O.C.G.A. 33-9-26?

9            MS. MORRIS:  If that is the number saying if an

10  insured has a dispute with its carrier about the application

11  of the rating plan rule, yes, ma'am, that is.  That is

12  almost verbatim the same as Florida's.  Of course, we have

13  the same dispute resolution process.

14           THE COURT:  I think with your candor in setting up

15  this issue, I know what your answer should be.  But can you

16  cite me any Georgia law or case citation that requires

17  administrative exhaustion of any administrative process

18  before bringing suit in a federal court?

19           MS. MORRIS:  On these facts, no.  I believe that

20  we cite a concurring opinion from an appellate judge in a

21  Georgia state court -- pardon me (pause) -- for the

22  proposition that -- *International Indemnity against*

23  *Cerulean*.  I believe that the concurring opinion I'm

24  referencing was in the *International* case.  And the judge

25  seemed to imply -- the way I read it, I could be wrong --

 1   that had the litigants and the trial court below preserved

 2   it as an issue, the appellate court could have resolved it,

 3   but that had not been done.

 4         That, too, is regrettably very common because

 5   these cases are litigated like contract claims.  And it

 6   takes a hyper amount of expertise, way more than I've got,

 7   to figure out what these premiums are.  And that is why the

 8   regulators should be doing it.

 9         THE COURT:  Thank you, counsel.

10         MR. SAVAGE:  We obviously disagree.

11         THE COURT:  Yes, you may.

12         MR. SAVAGE:  So this is a contract case, and you

13   know what you're doing in a contract cases.  This is not a

14   case to send to the insurance commissioner.  *International*

15   -- the *Cerulean* case deals with switching Blue Cross Blue

16   Shield from a not-for-profit to a for-profit company.

17         We're not fighting them saying the math is done

18   wrong here.  We're saying that we pay benefits; you pay

19   costs.  That's a contract issue.  We're fighting them

20   saying, "On the manual rate, you promised us 17 percent.

21   You're charging us 26 percent."

22         But this is not something for the insurance

23   commissioner.  And I think if it were -- and maybe the

24   insurance companies can look in the mirror on this stuff.

25   They should really beat the tom-toms early in these cases.

1    They say that it was a failure to exhaust administrative

2    remedies, but if we didn't do it, let's not wait a year to

3    get to it.

4            This is a contract issue.  There's nobody on the

5    -- I don't even know who's on the insurance board in Georgia

6    that can handle contract issues like well read and good

7    judges.  That's what this is about.  This is a contract

8    case.  That is a not a good argument.  Thank you.

9            THE COURT:  Counsel, thank you.

10           MR. SAVAGE:  Thank you for your time.

11           THE COURT:  We will be in recess.

12       (Recess at 12:12 p.m.)

13

14

15

16

17                         CERTIFICATION

18

19           I certify that the foregoing is a true and correct

20    transcript of the stenographic record of the above-mentioned

21    matter.

22

23    *Norma Hatfield*

24

25    _____      September 5, 2013
      Norma Hatfield, FPR, Court Reporter